Case number 22-1069 Neon Gray v. Autozoners LLC et al. Oral argument not to exceed 15 minutes per side, with 15 minutes to be shared by the defendants. Mr. Cacarli, you may proceed for the appellant. Good morning, your honors. May it please the court, I'm Cacarli on behalf of Plaintiff Appellant Neon Gray, and I'd like to reserve two minutes for rebuttal. Plaintiff appeals the district court's decision to grant defendants summary judgment. The issues before this court are 11 defendants who violated plaintiff's civil rights under 42 U.S.C. section 1981 and Michigan's Elliot Larson Civil Rights Act and caused plaintiff intentional infliction of emotional distress on August 7, 2020. This court's review is de novo. All facts and inferences are drawn in favor of plaintiff. Now, before I begin, I'm happy to answer any questions the court may have. Very well. According to defendant Nicholas Isles, on August 7, 2020, a co-worker alerted him to two African-American males, including plaintiff, entering defendant Autozone's store. Mr. Isles was assistant store manager and in charge of the store. He approached plaintiff and found plaintiff had purchased a battery from Autozone that was now defective but still under warranty and wanted to replace it with a functioning battery. This was a common request. Mr. Isles testified he dealt with customer requests like this on a daily basis. Was it common for someone to ask for a fourth battery, to return a battery four times? Yes, your honor. It is? I'm sorry? It is a common occurrence that somebody requests a battery four times? Yes, your honor. Yes, your honor. Francisco Segovia is an Autozone employee that also testified in this matter, testified that there are, quote, many occasions where a customer has come back in on four separate occasions within a two-month period asking for a new battery pursuant to the warranty. And Mr. Isles also admitted that it would not be, quote, not be crazy for a customer to have multiple warranty exchanges. And Mr. Isles said that there are times when a customer would experience a failure of a part after only a short time after installation. Now, Mr. Isles himself also testified that there is no policy limiting how many times a person can exchange a battery through warranty. And this is confirmed by the text of the warranty policy, which has no such limitation listed. Mr. Segovia also said that while protocol is to return a battery that tests good back to the customer, if the customer is unhappy with the result, Autozone will still replace the battery. Now, Mr. Isles also testified that he will test the battery before determining whether to exchange it pursuant to the warranty. If the battery tests well, then he moves on to check other car parts to determine the issue. Except Mr. Isles does not do that here. He decided not to exchange the battery before he even tested it. Instead, he claimed Plaintiff previously got a warranty exchange and decided not to honor another one. And when Plaintiff protested the decision, Mr. Isles suggested that Plaintiff, a then 21-year-old male, misuse or abuse the battery by attaching it to aftermarket sound systems. Mr. Isles claimed this was a common issue for his store's customers. Was the sound issue comment brought to the attention of the district court in response to defendant's motion for summary judgment? I'm sorry, it cut off just as you said which comment? The sound system comment that you just referred, did you bring that to the attention of the district court in opposition to defendant's motion for summary judgment? Yes, your honor. Okay, tell me, I don't think you did. And if you did, I'd like you to reference your, we're in the district court, you did bring that sound system issue to their attention. Okay, your honor, if you look at, this is BCF number 22, page ID 381 through 382, you will see that Plaintiff references Mr. Isles' statements that Mr. Isles may have installed aftermarket sound systems. To his vehicle and that this was something that his customer base, which is mostly, which is of many black folks and Hispanic folks, did from his store. And this was addressed in that motion response as well as, I believe, Plaintiff's response to defendant Nicholas Isles. Okay, thank you. Thank you, your honor. Now, according to two witnesses, Mr. Isles went even further and suggested that the battery was used to cook drugs. Now, perhaps because Mr. Isles knew he crossed the line, Mr. Isles then decided to put the battery on the charger rather than process a warranty exchange. When Mr. Isles returned to get a response he can show AutoZone corporate, Mr. Gray began recording on his phone and asked Mr. Isles to explain why he would not exchange the battery. In response to this request for service based on a contract, knowing he is on video, Mr. Isles tells Mr. Gray to put him on Facebook as the white power oppressor. What does it mean to be a white power oppressor? Is that somebody that oppresses white people? No, your honor. Mr. Isles testified exactly what he meant when he called himself the white power oppressor. He did? He admitted that it was, quote, a synonym for racist. I quote, it was nasty, insulting words that I felt captured the moment. He admits he was, quote, mocking the customer's concerns and trivializing them. And AutoZone's own investigation found that Mr. Isles continued joking about customers with a co-worker and even called another co-worker his, quote, skinhead brother because that employee had a shaved head. So he was very clear what he meant when he said white power oppressor to an African American male. I mean, if you're taking him at his word, he's not serious. He said I'm sarcastic. I don't really mean that. I mean, you either take him at his word or you don't. Right? And he said I'm not really a white oppressor, but I'm sarcastically calling myself that. Right? Isn't that what he said? He may have said, yes, he does say that he was being sarcastic, Your Honor, but that goes into the mind of the defendant. And that is a question of fact for the jury. And as I've elaborated, the defendant has already explained what he meant when he said it. And moreover, Your Honor. Well, he didn't mean it. He didn't mean the comment literally. He didn't mean I'm literally oppressor of white people. And he said, I just said that sarcastically. So, I mean, that's what he meant. That's what he said. But literally, a white oppressor is somebody that oppresses white people, not African Americans. Isn't that correct? Your Honor, that would be correct, possibly. Literally, that's correct. So you either take him literally or you take him sarcastically. But either way, I don't see how that establishes a racist intent. That's all. Help me understand how you would use that comment. The white power oppressor, let's assume that that means that he says, I am a white power oppressor of other people. I have that power. We'll just assume that that was the intent. I'm struggling a little bit with seeing how that's direct evidence. Clearly would fit within a circumstantial evidence analysis, as I would see it. But the cases that you cite are DiCarlo and Shett, I think, or Tuscaloosa Public Schools. Both of those have clear statements about the plaintiff. You know, calling them a pejorative slur for Italian Americans or telling them that the board wants somebody younger. Tell me how you think that comment plays in the analysis. Certainly, Your Honor. The cases that you refer to, yes, in DiCarlo, for example, the victim was called a pejorative that is discriminatory towards Italian people. The word is spelled W-O-P, and it does not mention any person's race. In our other case, where there's a quote, we want someone younger, it does not mention any person's age. But both of those were sufficient to show direct evidence that discrimination motivated the defendant's actions. You know, Mr. Isles' declaration, assuming these facts, that he is the white power oppressor, directly includes his race, white, as being superior to all other races, but especially black. White power is literally enchanted by white supremacists at KKK and white nationalist grounds. And Mr. Isles continued with the racial rhetoric after the incident, calling his coworker the skinhead brother. And, Your Honor, the Supreme Court in Pricewaterhouse v. Hopkins found that stereotyped remarks can be evidence that a protected class played a part in decision making. Was that a circumstantial evidence analysis? You can use circumstantial evidence to prove direct evidence. And you can show that there was intent behind direct evidence statements circumstantially. And here, by showing, by Mr. Isles' saying, stereotypical comments, like an African American male might be using his battery to hook it up to loudspeakers or to cook drugs, those are stereotypes that a court may look at. You can use circumstantial evidence to establish direct evidence? Is that what you said? I thought the two were different. It may have been a circumstantial analysis. I apologize for the confusion. Okay, I'm sorry you were talking over me. Circumstantial evidence and direct evidence are different things, are they not? That is correct, Your Honor. Speak to us about your analysis of the intentional infliction of emotional distress claim. That's a pretty high burden to meet. It's got to be distress inflicted that's so severe that no reasonable person can be expected to endure it. What rises to that level in this case? Certainly, Your Honor. The defendant's own employee, AutoZone's Kayanna Webb, testified that when she heard Mr. Isles refer to himself as the white power oppressor, she found it extremely upsetting and she left the building, the entire store, so that she could report it to her manager. This is just an example of an African American who heard the comment, who received it in the way that it was intended to be received, and found it extremely offensive. Mr. Gray also found the comments were extremely offensive. He spoke with his family members and discovered a lot of history about white power and white nationalists, and that caused him to suffer a lot of trauma. Mr. Gray began doing a lot of self-help and finding methods to cope with the trauma, and Your Honor, Mr. Isles' argument that he oppresses white power when he called himself the white power oppressor, it's simply not accurate when he testified he's not part of any civil rights organizations or special interest groups or does anything to prevent white power. Your Honor, I see that my time is expiring, and I'll reserve the rest of my time for the webinar unless there's any questions. Okay. All right, we'll hear from your adversary, Mr. Well, we've got divided time, Ms. Riley and Mr. Berger. Ms. Riley, are you first? Yes, Your Honor. Okay. May it please the Court, I'm Lori Riley from Jones Walker, representing AutoZoners LLC. When Mr. Carr was speaking, he left out some key facts which also impact the legal analysis. To address the Griffin's question, while Mr. Segovia may have said he had another person or people who asked for a fourth new battery in a short time, there's absolutely no testimony in the record at all that any person was allowed to automatically receive four new batteries in exchange under the warranty program. Mr. Gray was not denied service. He was given a service by AutoZone on August 7, 2020. His battery was charged, which is a free service that AutoZone offers. He had purchased one battery back in May of 2020. He himself was allowed to exchange it and get a brand new one three times before August 7, 2020 automatically. There is no automatic right to an exchange because the warranty explicitly states it does not cover if there is another faulty part or if the battery is being misused. But under your argument, there's not a requirement that there be a denial of service if you are using the analyses that the courts have employed that someone receives services in a markedly hostile way that supports an inference of racial discrimination. Why isn't this a markedly hostile case? Three reasons, Your Honor, and even after Christian and some of the cases that have addressed what markedly hostile means. The first part of the markedly hostile definition is it has to be contrary to the company's financial interests. And a lot of the cases, as in Christian and some of the others, people were denied service and the company couldn't get money from them. And so it was found that, well, no reasonable company would want to lose money. Here, Mr. Isles' actions were not only not contrary to AutoZone's financial interests, but trying to preserve AutoZone's financial interests. Mr. Gray bought his battery for $109 new back in May. Every time he brought in another battery to exchange, even though the battery worked, the company could not resell that battery as new and face a significant loss. And that's record evidence provided by Ms. Garcia. So it wasn't in AutoZone's financial interests to keep giving someone a brand new battery, which AutoZone can sell for $109, when the battery they're returning is going to have to be marked down significantly to sell. So that is one reason why Mr. Isles' conduct was not contrary to the financial interests. It's also not so far outside of widely acceptable business norms. Because, again, AutoZone is in the business of helping customers get the parts they need to do the job right the first time. When Mr. Isles sees, wait a minute, the odds of Mr. Gray getting five bad batteries out of the box, off the shelf, is so statistically unlikely. And based on his own automotive experience, which Mr. Gray lacked, Mr. Isles was reasonable to assume it can't be five bad batteries. It must be something else, such as the alternator, which works with the battery, isn't working properly. Or the battery was being misused. So it's his job to help the customer not have to, quite frankly, return to the store five times to have to make exchanges of a part. And it's certainly not so arbitrary that it would support a rational inference of discrimination. Mr. Gray testified that in the many times that he shopped at this store, Mr. Isles had helped him on a prior occasion without any incident. Mr. Isles was simply trying to engage in a conversation with Mr. Gray to find out what the real issue was, because it certainly wasn't the battery. Mr. Isles turned out to be right when the African-American district manager spoke to Mr. Gray later that day. He said the same thing that Mr. Isles was saying. Don't think it's the battery. It's got to be, you know, maybe it's the alternator or you need a higher power battery for your sound system. And Mr. Gray went in the next day and, in fact, got a new alternator and a new battery. So there's nothing to support a rational inference of discrimination. I'm sorry. It's hard when we're apart. But I think the question is that there is evidence in the record from Segovia that four battery replacements are not completely unusual or out of the question. Your opposing counsel argues that this is, that they often exchange things in order to service people. And the question here is whether there's some other indication that there was discriminatory intent. And, of course, you've heard the argument and briefed the argument that that other evidence is the statement regarding a white, you know, call me a white power oppressor. So how does that not have an indication in general parlance in society of a racial distinction? Your Honor, first turn into a question about Mr. Segovia. Again, Mr. Segovia was only asked whether customers have requested four new batteries in two months. He was not asked whether he himself gave customers four new batteries in two months. And there is absolutely no evidence to suggest he did. More importantly, Mr. Isles himself had never had any customer return a battery more than one time before Mr. Gray. And so Mr. Segovia's testimony confirms Mr. Isles. The protocol is if the employee tests the customer's battery and it works, the protocol is that the battery is given back to the customer. It wasn't the problem here, but counsel, wasn't the problem here that he did not follow that usual procedure. He did not first test and then make a decision about what AutoZone would do. Here, in fact, he altered the regular procedure and said no first. And only after there was a complaint did he actually test the battery. Why couldn't a reasonable jury consider that? Yes, Your Honor. He tested the battery not in response to a complaint. He told Mr. Gray, if the battery doesn't charge, I will give you another new battery. There is no protocol in the evidence that when someone has the warranty exchange records that Mr. Gray had, that they would just automatically give a new battery. Mr. Isles would say normally, but again, he had only had a customer return a battery once. There's no protocol that when someone has returned four good working new batteries, that they should again just be handed one automatically off the shelf. With respect to the white power oppressor comment, not only do we believe that is not direct evidence of discrimination, we don't believe it can be viewed as circumstantial evidence of discrimination. When, as Judge Griffin pointed out, the comment itself makes no sense if you take it literally. If you're not taking it literally, then it's sarcastic. And a sarcastic comment cannot be evidence of any kind of discrimination. If this panel was to ask me, why, Ms. Riley, are you speaking for ten minutes and Mr. Berger is going to speak for five, it must be because you think men are stupid. And if I was to repeat the panel's comment and say, put me on YouTube, you're right, I think men are stupid. I realize this is on YouTube. I would hate to think that that could be construed somehow as direct or circumstantial evidence when I'm just reacting or responding or repeating. Well, here's the problem, counsel, with that. You're telling me I can't be treated, I can't have this assumed against me because I said it this way. I was sarcastic. But you're a party to this litigation. The question is who makes the decision whether this was appropriate or inappropriate or evidence of discriminatory intent. And that is a decision that has to be made either by the court, depending on the evidence, or if there's any dispute about it, that's a jury question. Isn't that the way the process works? No, we don't believe it is a jury question because, again, Mr. First of all, I have to say, remarkably, counsel, it must support a rational inference of discrimination. And we don't believe that could be inferred here for the reasons I mentioned. But also, it has to be tied to the actual decision. Mr. Parker left out there was a two-hour difference in between when Mr. Gray first came in and he was told, I'm not going to automatically give you another new battery. I will test it and see if it works. If it doesn't work, you'll get one. And then he comes back into the store two hours later, taking out his phone. And when Mr. Isles asked him, would you like to look at the warranty history with me, he says, no, I want to record you. And the comment is made in response to the recording and being accused, again, of racism, not in connection with the not giving an automatic warranty exchange again. And I realize my time is up, Your Honor, so I will let Mr. Berger speak, unless the panel has any other questions. I think not. Yes, good morning, Your Honors. Michael Berger on behalf of Mr. Isles. Just want to follow up on Judge Strauch here. Your question regarding the unusual behavior that plaintiff's counsel argues. He argues that Mr. Isles typically would test the battery and then that he didn't go through that regular procedure. It's therefore helping that markedly hostile argument. I disagree with that. And the reason is, this isn't a usual situation for Mr. Isles. Mr. Isles is presented with, for the very first time, a fit battery exchange. So he goes through his regular troubleshooting analysis, as one would expect one would do, when presented with this type of situation. If the battery continues to be the problem, we need to look at the situation and say, wow, maybe it's not the battery. So that's what Mr. Isles starts doing, is he starts thinking about other reasons. He starts thinking about maybe it's the alternator that the battery works with. Maybe there's some sort of stereo system that's causing the battery to drain. So that's why it's not arbitrary. That's why it doesn't assist the markedly hostile argument, because it is an unusual situation. A deviation from procedure at this time is necessary. Mr. Berger, how about the comment that he may be cooking meth with the battery? Is that a racial comment? No. First and foremost, I would say, for Mr. Isles' sake, he does deny it, but we have to accept it for this purpose, for the purposes of a dispositive motion. But no, not necessarily. It depends on the context of the situation. Obviously, throughout the nation, we know that people of all races sell drugs, try to cook drugs, things like that. So not necessarily. In this particular situation, when we're looking at Mr. Stone's deposition testimony, he testifies that it's literally right before the phone comes out. And based on plaintiff's admission in their response to the motions, that's ECF 22, it's clear that the parties admit and do not dispute that there are disagreements. Plaintiff has already said, hey, Mr. Isles, I don't think you're giving me the battery because of my race. It really supports the conclusion, the drug comment, if you were to believe Mr. Gray and Mr. Stone, that hey, look, this is just an argument between the parties and they're upset with one another. They're just kind of saying things. So it's not necessarily a racial comment. Is meth more, we've got cases that said crack cocaine is more directed to the African American community and crack cocaine comments can have a racial overtone. I'm from northern Michigan and cooking meth, I associate with people in the upper peninsula. The Yupers are known to cook meth. And I don't see, you know, where I live, there's not a racial component for African Americans. But here, this is what, outside of Detroit? What city or in Detroit is this? This is in the Allen Park area. Allen Park. Downriver. For people that don't know, it's just south of Detroit. Fairly racially diverse, more blue collar type of area. Okay. So, I mean, people cooking meth down there could be any race at all, I suppose, couldn't they? In theory, in theory, though, I do think you bring up a good point. And Mr. Isles testified to this. Cooking meth does tend to be associated more with white people. I can draw on my personal experience. My very first trial involved methamphetamine and, of course, it was all white people. Let me follow up on that, counsel. So there's some questionable use of the sound system and the drugs and some indication that that's not a necessary part of your claim. What is the evidence that you think pushes you over so that you have found a dispute of material fact that needs to go forward? Is it just the white power comment? Is that the entirety of the evidence that you think supports your claim? Judge Strong, I represent Mr. Isles. We believe that there is no dispute of material fact and that judgment should be granted in Mr. Isles' favor, therefore affirmed. Okay. All right. Thank you. All right. My time is up. I will pass to Mr. Khoury. Thank you. Hello, Your Honors. I'll be brief. Just to touch up, Mr. Segovia testified that when a customer was still upset after being denied a battery exchange, AutoZone would still replace it. There was argument regarding whether defendants provided Plaintiff a service, and quite simply, Plaintiff was not provided a service. He didn't even get the battery charged. As counsel argued, Plaintiff testified that the battery never worked afterwards, and counsel just argued that Plaintiff actually had to buy a new battery following this incident. So there was no service that actually occurred that day. And, Your Honor, there were some discussions regarding... Let me go back and restate my question that was really for you, as opposed to opposing counsel. What is the basis of your claim? What are the evidentiary pieces that you base your claim on? Because we've heard some from you about the drugs and some spots in the transcript where drugs are mentioned, but aftermarket is not, and vice versa. So tell me what evidentiary pieces constitute your claim. Thank you, Your Honor. Of course, the right power oppressor comment, but also specifically Mr. Isles' testimony regarding what he meant when he said it, that it was a synonym for racist, that he wanted to be nasty and sultry and to mock and trivialize the plaintiff. That, in conjunction with the stereotypes that he spewed, showed that there was racial motivation in his head. And, Your Honor, Mr. Isles himself testified that the cooking meth comment was a racist comment. He just denies that he even wanted to say it, although there are two witnesses that said that he did. Well, Your Honor, we talked about the case law that supports our position, how there was no explicit mention of race or age, but still found sufficient evidence of discrimination. And for those reasons, unless there's any other questions, I'm going to request that this honorable court reverse the district court's decision. All right, we appreciate the argument you've all given, and we'll consider the case carefully. Thank you.